**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | | |
|---|---|---|
| Tempie L. Adams, | ) | |
| | ) | Civil Action No.: 1:16-cv-03415-JMC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| | ) | |
| United States Department of Labor, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Tempie L. Adams ("Adams") brings this action for review of the Department of Labor's ("DOL") denial of her claim for benefits under Part E of the Energy Employees Occupational Illness Compensation Program Act of 2000 ("EEOICPA"), 42 U.S.C. §§ 7384–7385s-16, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. (ECF Nos. 1, 26.) Because DOL's decisions are arbitrary and capricious under the EEOICPA and the APA, Adams' claim is **REMANDED** to DOL for further administrative proceedings consistent with this decision.

## I. BACKGROUND

### A. Statutory and Regulatory Background

The EEOICPA establishes a compensation program for "covered employees" and "survivors of such employees" for "illnesses incurred . . . in the performance of duty for the Department of Energy and certain of its contractors and subcontractors." 42 U.S.C. § 7384d(b). Congress established the compensation program because "a large number of nuclear weapons workers at sites of the Department of Energy . . . were put at risk without their knowledge and consent . . . ." 42 U.S.C. § 7384(a)(2). Additionally, Congress found that "[s]tate workers'

compensation programs do not provide a uniform means of ensuring adequate compensation" for employees at nuclear sites, and "[t]o ensure fairness and equity, . . . the Department of Energy and its predecessor agencies should have efficient, uniform, and adequate compensation for beryllium-related health conditions and radiation-related health conditions." 42 U.S.C. §§ 7384(a)(7)–(8).

Substantively, under Part E of the EEOICPA, covered employees[1] may obtain monetary compensation for an impairment and/or wage loss due to a "covered illness contracted . . . through exposure to a toxic substance at a Department of Energy facility." 42 U.S.C. §§ 7385s-2(a)(1)(A)(ii), (a)(2)(A)(i). As opposed to the Department of Energy ("DOE"), DOL is tasked with determining whether an individual possesses a covered illness under the EEOICPA. 42 U.S.C. § 7385s-4(c)(2). In some instances, an employee is considered to have a covered illness if he or she establishes: (1) "it is at least as likely as not that exposure to a toxic substance at a [DOE] facility was a significant factor in aggravating, contributing to, or causing the illness"; and (2) "it is at least as likely as not that the exposure to such toxic substance was related to employment at a [DOE] facility." 42 U.S.C. §§ 7385s-4(c)(1)(A)–(B). *See also* 20 C.F.R. § 30.900 (stating that, in order to receive benefits under Part E of the EEOICPA, an employee must show that they are a "covered employee" who has contracted a "covered illness through exposure to a toxic substance at a DOE facility" and possess an "impairment" that is the result of the covered illness). A claimant requesting benefits must show that he or she is entitled to those benefits by a preponderance of the

---

[1] Pursuant to the Energy Employees Occupational Illness Compensation Program Act of 2000 ("EEOICPA"), a covered employee is "any Department of Energy contractor employee determined . . . to have contracted a covered illness through exposure at a Department of Energy facility." 42 U.S.C. § 7385s(1). A covered illness includes "an illness or death resulting from exposure to a toxic substance." 42 U.S.C. § 7385s(2).

evidence.[2] 20 C.F.R. § 30.111(a). DOL regulations require that the preponderance of the evidence standard be met for "each and every criterion necessary to establish eligibility" for compensation under Part E of the EEOICPA. *Id.*

Regarding the procedural administration of the EEOICPA, Congress explicitly authorized the President of the United States to "carry out the compensation program through one or more [f]ederal agencies or officials, as designated by the President." 42 U.S.C. § 7384d(a). In 2000, President William J. Clinton authorized DOL to adjudicate claims for benefits and administer the compensation program under the EEOICPA. Exec. Order. No. 13,179, 65 Fed. Reg. 77,487 (Dec. 7, 2000). In order for an individual to claim benefits, he or she must first file a claim in writing and submit it to DOL's Office of Workers' Compensation Programs ("OWCP"). 20 C.F.R. §§ 30.5(cc), 30.100(a). An individual submitting a claim is entitled to seek benefits "for only certain conditions that are potentially compensable" under the EEOICPA. 20 C.F.R § 30.100(b).

After submitting the necessary documents to develop a claim, the OWCP issues a recommended decision, including findings of fact and conclusions of law, as it relates to a claim. 20 C.F.R. §§ 30.300, 30.306. A claimant is permitted to file an objection with the Final Adjudication Branch ("FAB") regarding the OWCP's recommended decision. 20 C.F.R. § 30.306. In addition to objecting to the OWCP's recommended decision, a claimant may request a live hearing before the FAB. *Id.* The FAB is required to consider objections to a recommended decision and issue a final decision. 20 C.F.R. §§ 30.312, 30.316(b). Upon the date of issuance of a final decision, a claimant has thirty (30) days to request the FAB to reconsider its final decision. 20 C.F.R. § 30.319(a). If a timely request for reconsideration is made, the final decision from the FAB

---

[2] According to the Department of Labor's ("DOL") regulations, "[p]roof by a preponderance of the evidence means that it is more likely than not that the proposition to be provided is true." 20 C.F.R. § 30.111(a).

is no longer deemed "final." *Id.* A hearing is not available during the reconsideration process, but "[i]f the FAB grants the request for reconsideration, it will consider the written record of the claim again and issue a new final decision on the claim." 20 C.F.R. § 30.319(c). However, "[i]f the FAB denies the request for reconsideration, the FAB decision that formed the basis for the request will be considered 'final' upon the date the request is denied, and no further requests for reconsideration of that particular final decision of the FAB will be entertained." 20 C.F.R. § 30.319(c)(2). While a claimant is barred from pursuing a second reconsideration decision, he or she may file a written request for a claim to be reopened based on "new evidence of either covered employment or exposure to a toxic substance[] . . . ." 20 C.F.R. § 30.320.

## B. Factual Background

Adams was employed at the Savannah River Site ("SRS"), by contractors[3] for DOE, from August 28, 1978, to May 9, 2005. (ECF No. 26 at 2; ECF No. 28 at 4 n.3.) During her time at SRS, Adams was an electrical and instrumentation mechanic ("E&I mechanic") for approximately three (3) months, a clerk/typist for approximately ten (10) years, and a financial analyst for approximately sixteen (16) years and five (5) months. (ECF No. 22-4 at 209–10.) During Adams' tenure as a financial analyst, she performed field audits as a precious metals auditor.[4] (ECF No.

---

[3] As confirmed by DOL in a prior administrative proceeding, Adams worked with the following two contractors for the Department of Energy ("DOE"): E.I. DuPont de Nemours and Company and Westinghouse Savannah River Company. (ECF No. 22-5 at 233.)

[4] Neither party has disputed that Adams was a precious metals auditor. (ECF No. 22-1 at 5, 249–251; ECF No. 22-4 at 63, 112.) Moreover, during an administrative hearing, Adams testified that she was a "precious metal[s] accountant." (ECF No. 22-1 at 275.) Her testimony was consistent with a prior occupational questionnaire. (ECF No. 22-4 at 219.) However, the administrative record fails to provide a consensus, between Adams and DOL, regarding the length of time that Adams held the position and the position's required tasks. (*Compare* ECF No. 22-4 at 79, *with* ECF No. 22-1 at 5.) Based upon the pleadings and administrative record, the parties seem to vigorously dispute the specific details of Adams' position as a precious metals auditor. (*See* ECF No. 22-1 at 4–5, 77–79, 273; ECF No. 22-4 at 64, 79; ECF No. 26 at 2; ECF No. 28 at 5, 11.)

22-1 at 249; ECF No. 22-4 at 63, 112, 219.) Well before initiating this suit, Adams filed claims for

breast cancer and beryllium sensitivity with the OWCP.[5] (ECF No. 22-5 at 41, 159, 351.) On April

4, 2006, DOL denied Adams' claim for breast cancer. (ECF No. 22-5 at 291.) Respectively, on

November 20, 2013, and June 30, 2014, Adams' claims for beryllium sensitivity were approved,

and she was awarded medical monitoring benefits and sixty thousand dollars ($60,000.00) under

Part B and Part E of the EEOICPA. (*Id.* at 80, 233.) Along with the aforementioned claims, Adams

also pursued a claim for chronic obstructive pulmonary disease ("COPD"),[6] the claim at issue, on

August 28, 2014.[7] (*Id.* at 61.)

Also occurring on August 28, 2014, and in support of her claim for COPD, Adams provided

DOL with a bronchochallenge report, pulmonary function test ("PFT"), and a medical report from

Dr. R. Hal Hughes ("Dr. Hughes"). (*Id.* at 61–68.) Dr. Hughes' report, from May 6, 2014,

diagnosed Adams with occupational COPD and specifically opined that Adams' "[o]ccupational

exposures [to beryllium] . . . at least likely as not contributed" to her occupational COPD.[8] (*Id.* at

---

[5] Adams' claim for breast cancer was filed on April 19, 2005, while her claims for beryllium sensitivity were filed, respectively, on August 14, 2013, and January 28, 2014. (ECF No. 22-5 at 41, 159, 351.) Adams first pursued medical monitoring benefits for her beryllium sensitivity and later sought impairment benefits. (*Id.* at 41, 159.) Before filing any of these claims, Adams was diagnosed with breast cancer on September 19, 1995, and beryllium sensitivity on August 7, 2013. (ECF No. 22-4 at 103.)

[6] According to one scientific article submitted by Adams to DOL, chronic obstructive pulmonary disease ("COPD") is "defined as . . . a disease characterized by airflow limitation that is not fully reversible and is progressive and associated with an abnormal inflammatory response of the lungs to noxious particles or gases." (ECF No. 22-1 at 107 (citing Enrique Diaz-Guzman et al., *Occupational Chronic Obstructive Pulmonary Disease: An Update*, 33 CLINICS CHEST MED. 625, 626 (2012).)

[7] Adams was formally diagnosed with occupational COPD on May 6, 2014. (*See id.* at 165–69, 250, 254.)

[8] According to evidence submitted by Adams, beryllium is a "hard, light-weight metal . . . . It is often blended with other metals and ranges in color from gray to white, copper, or gold." (*Id.* at 208 (citing NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, HEALTH CONCERNS FOR WORKERS WHO WORKED AROUND BERYLLIUM (2011), https://www.cdc.gov/niosh/pgms/worknotify/pdfs/Beryllium_Notification-508.pdf (last visited

65.) On February 12, 2015, DOL "was not able to establish that beryllium exposure [had] a known link to COPD" and requested that Dr. Hughes provide a "detailed [and scientific] rationalization" for his conclusion that Adams' COPD was linked to beryllium exposure. (*Id.* at 53.) Dr. Hughes responded to DOL on February 19, 2015, with a handwritten note, stating: "In my group of [b]eryllium sensitive patients—41% have documented asthma compared to the general population of 6% asthma. My opinion is that the asthma is occupational due to beryllium exposures." (*Id.*) Once again, on May 11, 2015, Dr. Hughes diagnosed Adams with "mild COPD" and concluded "[o]ccupational exposures . . . at least as likely as not contributed to her COPD." (*Id.* at 14.) After receiving more submissions from Adams regarding her occupational history, subjective complaints, and work duties, DOL confirmed her various jobs at SRS, including the length of time she spent on each specific job. (*Id.* at 26–37, 48; ECF No. 22-4 at 209–12.)

Eventually, DOL engaged in several important administrative actions, all of which are relevant to this dispute. First, on March 18, 2015, DOL conducted a search on its Site Exposure Matrices ("the SEM") in order to determine the toxic substances present at SRS and the effect of those substances on specific workers.[9] (ECF No. 22-4 at 112.) The SEM "contains information regarding scientifically established links between toxic substances and illnesses." *EEOICP Site Exposure Matrices Website—Home Page DOE Facilities and RECA Sites Data*, U.S. DEP'T OF LABOR, https://www.sem.dol.gov (last updated May 22, 2018). Quite importantly, while "DOL continually updates these relationships in [the] SEM as new disease associations are published in

---

Nov. 26, 2018).) Beryllium is "found naturally in rocks, coal, and soil." (*Id.*)

[9] According to DOL, "[the SEM] is a database maintained by DOL to organize its extensive collection of data regarding the various types of toxic substances present at particular covered DOE facilities, and the health effects those substances have on workers." (ECF No. 28 at 5.) Additionally, DOL's Recommended Decision states that "[t]he SEM has information regarding site investigations on likely toxic exposure by various factors such as job title/occupation, work processes, and buildings or other areas." (ECF No. 22-4 at 112.)

Haz-Map[,] [t]he causal links shown in [the] SEM *do not represent an exclusive list* of the pathways necessary for an affirmative Part E causation determination."[10] *Id.* (emphasis added). DOL's initial search on the SEM found that Adams was potentially exposed to, among many others, the following toxins while working at SRS: ammonia, asbestos, cement, chlorine, coal dust, diesel exhaust, nitrogen dioxide, sulfur dioxide, welding fumes, and wood dust.[11] (ECF No. 22-5 at 45–46.) At this stage, the SEM's results did not suggest that Adams was exposed to beryllium, and there is no indication that DOL conducted any inquiry into Adams' potential exposure to beryllium. (*See id.*)

Second, after conducting the general, initial search on the SEM, DOL forwarded Adams' case to a certified industrial hygienist ("IH"). (ECF No. 22-4 at 102.) DOL only asked the IH whether Adams' position as an E&I mechanic would have brought her "into contact" with specific toxic substances, "how much exposure [was] likely for each substance[,]" and the "likely exposure scenarios."[12] (*Id.* at 207–08.) In regard to specific toxic substances, DOL did not question the IH

---

[10] The SEM is "derived from the Haz-Map database published by the National Library of Medicine." *EEOICP Site Exposure Matrices Website—Home Page DOE Facilities and RECA Sites Data*, U.S. DEP'T OF LABOR, https://www.sem.dol.gov (last updated May 22, 2018). DOL's position is that the Haz-Map "contain[s] links between chemicals and occupational diseases established by current scientific evidence." (ECF No. 28 at 5 n.4 (citation omitted).)

[11] The administrative record reveals that DOL conducted subsequent searches on the SEM after the Recommended Decision was handed down and before issuance of the Final Decision. (ECF No. 22-2 at 2–14.) DOL suggests that its subsequent searches were conducted *before* the Recommended Decision and considered at that critical stage; however, this suggestion is belied by the administrative record before the court. (*Compare* ECF No. 28 at 7–6, *with* ECF No. 22-2 at 2–14, *and* ECF No. 22-5 at 45–46.) Unlike the subsequent searches on the SEM, the initial search by DOL seems to be a general search of possible toxic substances related to COPD because, contrary to the later searches, it is not narrowly confined to a specific "labor category" at SRS. (*Compare* ECF No. 22-5 at 45–46, *with* ECF No. 22-2 at 2–14.) Upon a careful administrative review, nothing in the administrative record shows that DOL conducted an E&I mechanic search on the SEM *before* referring Adams' case to medical professionals for their opinions. (*Compare* ECF No. 28 at 7–6, *with* ECF No. 22-2 at 2–14, *and* ECF No. 22-5 at 45–46.)

[12] DOL asserts that, based upon searches in the SEM, Adams' other positions did not show "the potential to be exposed to any toxic substance having a potential effect of COPD," thereby her

about Adams' exposure to beryllium, but requested information relating to asbestos, cement, chlorine, coal dust, nitrogen dioxide, phosgene, and silicon dioxide (crystalline). (*See id.* at 208.) The IH issued his report on September 28, 2015, and determined that "there [was] no evidence to suggest that [] Adams, in her capacity as an E&I mechanic, would have had significant exposures to cement, chlorine, coal dust, nitrogen dioxide, phosgene, or silicon dioxide (crystalline)." (*Id.* at 103, 105.) According to the IH, exposure to those toxic substances "would have been incidental in nature . . . and not significant." (*Id.* at 105.) However, the IH did conclude that Adams, as an E&I mechanic for three (3) months, was "exposed to asbestos at greater than incidental levels[,] [but] [h]er exposures to asbestos would have been infrequent in nature . . . and would have ranged from low to moderate levels." (*Id.*) The IH did not make any conclusions or findings pertaining to Adams' exposure to beryllium. (*See id.* at 103–105; ECF No. 22-1 at 252.)

Third, after the assessment by the IH, DOL referred Adams' case to a contract medical consultant ("CMC"). (ECF No. 22-4 at 130.) DOL asked the CMC whether, given the IH report, Adams' work history "make[s] it at least as likely as not that exposure to toxic substances during [her] course of employment was a significant factor in aggravating, contributing to, or causing

---

other positions were not forwarded to the IH. (*See* ECF No. 28 at 5–6.) Likewise, the FAB's Final Decision indicated that:

> "the District Office used the SEM database to determine potential exposures based on [Adams'] various labor categories of E&I mechanic, clerk/typist[,] and financial analyst. The SEM did not identify that a clerk/typist or financial analyst had the potential for exposure to a toxic substance with the potential health effect of COPD. The SEM, however, did identify that an E&I mechanic had the potential for exposure to a toxic substance with the potential effect of COPD, thus [Adams'] case was forwarded to an IH for exposure evaluation."

(ECF No. 22-1 at 252.)

[her] claimed condition of COPD. (*Id.*) The CMC issued his report on October 15, 2015.[13] (*Id.* at 122–24.) In response to DOL's inquiries, the CMC ultimately opined that Adams' "work history does not make it at least as likely as not that exposure to toxic substances[,] during the course of employment[,] was a significant factor in aggravating, contributing to[,] or causing the claimed condition of COPD." (*Id.* at 124.) The CMC reached this conclusion by first reasoning that Adams did not have COPD because her PFTs failed to meet the required airflow limitation for a COPD diagnosis. (*Id.*) The CMC also cast doubt on the relationship between asbestos and COPD and found Adams' three (3) month exposure to asbestos to be "a trivial loss of lung function." (*Id.*) The CMC did not make any findings in regard to whether Adams' exposure to beryllium would have aggravated, contributed to, or caused her occupational COPD.[14] (*See id.*)

On December 9, 2015, DOL's OWCP District Office ("District Office") in Jacksonville, Florida, issued a Recommended Decision. (ECF No. 22-4 at 111–14.) The District Office reasoned that Dr. Hughes' response "lacked credible scientific documentation" and noted that the SEM database identified the potential toxic substances, those to which Adams was exposed, with a link to COPD. (ECF No. 22-4 at 113.) The District Office further opined that the findings of the IH and CMC, expanding upon the SEM's output, revealed that "Adams' workplace exposures to toxic substances were not a significant factor in causing, contributing to[,] or aggravating [her] COPD." (*Id.*) There is no indication that the District Office possessed any scientific literature from Adams when rendering its Recommended Decision. (*See id.*) The District Office informed Adams of her

---

[13] The CMC's report is the first instance where there is a mention of searches on the SEM for Adams' other occupations. (ECF No. 22-4 at 122.) However, those purported searches, which would have been conducted in 2015, are not within the administrative record before the court. (*See* ECF No. 22-4.)

[14] Indeed, DOL did not request the CMC to make any findings in regard to Adams' beryllium exposure and her occupational COPD. (*See id.* at 130.)

right to object to the Recommended Decision within sixty (60) days, which would require the FAB to issue a Final Decision regarding her claim. (*Id.* at 115.)

On February 3, 2016, within the sixty (60) day time limit, Adams, through her counsel, filed objections to the Recommended Decision, urged the FAB to grant her claim for COPD, and requested a live hearing. (*Id.* at 61, 65.) Adams primarily objected to the IH and CMC because they allegedly "failed to consider the full extent of her occupational exposure to toxic substances while working at SRS" and "all of [her] potential exposures." (*Id.* at 64.) Importantly, and a central issue before the court, Adams forcefully maintained that the IH did not identify beryllium as "a potential toxic [substance]" even though it "is associated with an increased risk of developing COPD." (*Id.*) In the same vein, Adams submitted that the CMC "did not consider the effect of beryllium exposure upon her development of COPD." (*Id.*) The essence of Adams' objection, which remains pertinent, concerns the failure of the District Office "to adequately develop [her] claim for COPD." (*Id.* at 65.) Along with her objections, Adams included two scientific articles to support her COPD claim.[15] (*See id.* 67–70, 72–73 (citing NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, HEALTH CONCERNS FOR WORKERS WHO WORKED AROUND BERYLLIUM (2011), https://www.cdc.gov/niosh/pgms/worknotify/pdfs/Beryllium_Notification-508.pdf (last visited Nov. 26, 2018); Mary K. Schubauer-Berigan et al., *Cohort Mortality Study of Workers at Seven Beryllium Processing Plants: Update and Associations with Cumulative and Maximum Exposure*, 68 OCCUPATIONAL & ENVTL. MED. 345 (2011).) Adams also requested "an informal hearing," and her request was granted on February 8, 2016. (*Id.* at 61, 56–57.) Before the hearing, Adams submitted additional evidence from her medical records. (ECF No. 22-1 at 252, 288.) Within those

---

[15] When objecting to the Recommended Decision, Adams conceded that Dr. Hughes, her physician, "did not provide adequate scientific or medical literature to substantiate her claim that COPD is linked with beryllium exposure." (*Id.* at 64.)

records, Dr. Hughes opined, in a medical report from February 18, 2016, that "approximately 40% of the beryllium sensitive patients and 50% of the chronic beryllium patients have asthma [and] COPD[,] which is the basis for my concluding that Ms. Adams has occupational COPD." (*Id.* at 288.) Dr. Hughes further suggested that Adams' "declining spirometry, abnormal scarring on [a] CT scan, and her clinical status is highly suggestive of CBD."[16] (*Id.*)

After a video hearing was held on March 29, 2016 (ECF No. 22-1 at 260–83), the FAB issued its Final Decision on May 25, 2016. (ECF No. 22-1 at 246–56.) The FAB's Final Decision denied Adams' claim for COPD. (*Id.* at 249.) The Final Decision began by recounting the lower administrative proceedings, summarizing Adams' scientific articles and objections, and detailing the video hearing that took place. (*Id.* at 249–53.) In regard to Adams' objection concerning the relationship between beryllium and COPD, the FAB's Final Decision noted that "[b]eryllium is not usually associated as a causative factor for development of COPD; therefore, the IH and CMC were not asked to evaluate your exposure potentials to beryllium in relationship [sic] to your COPD." (*Id.* at 252.) Perplexingly, the Final Decision then stated that "[a]lthough the DOE recognizes that [] beryllium was present at [SRS], the levels of exposure that an employee would need to develop beryllium sensitivity is much different than [that] to contribute to the development of COPD." (*Id.* at 253.) The FAB, contradicting its acceptance of Adams' beryllium sensitivity

---

[16] According to the SEM and a scientific article submitted from Adams, CBD is an acronym for chronic beryllium disease. (ECF No. 22-1 at 39; ECF No. 22-4 at 72–73 (citing Mary K. Schubauer-Berigan et al., *Cohort Mortality Study of Workers at Seven Beryllium Processing Plants: Update and Associations with Cumulative and Maximum Exposure*, 68 OCCUPATIONAL & ENVTL. MED. 345 (2011).) The National Institute for Occupational Safety and Health states that CBD is a lung disease resulting from beryllium exposure. (*See* ECF No. 22-4 at 67–70 (citing NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, HEALTH CONCERNS FOR WORKERS WHO WORKED AROUND BERYLLIUM (2011), https://www.cdc.gov/niosh/pgms/worknotify/pdfs/Beryllium_Notification-508.pdf (last visited Nov. 28, 2018).)

claim, further argued that "there [was] insufficient evidence in [her] case file to indicate that [she] work[ed] with beryllium during [her] DOE employment."[17] (*Id.*) Besides briefly summarizing the two scientific articles explaining the relationship between beryllium and COPD,[18] the FAB's Final Decision only stated the following in response to Adams' submitted articles: "Although your authorized representative provided studies linking COPD to exposures to beryllium, the studies involved employee's [sic] working at beryllium plants that would have had major exposures to beryllium, which does not apply in your case." (*Id.*) When deciding conclusions of law, the FAB maintained that Adams' claim "essentially boil[ed] down to which doctor's reports [were] of greater weight and credibility rejection." (*Id.* at 255.) The FAB found the CMC's report as "better reasoned" and "well rationalized" in comparison to Dr. Hughes' medical opinion.[19] (*See id.*) According to the FAB, because Adams did not present sufficient evidence to meet her burden of proof "to establish [her] entitlement to benefits," her claim was denied under Part E of the EEOICPA. (*Id.* at 255–56.) DOL informed Adams that she was permitted to request reconsideration of its Final Decision within thirty (30) days of its issuance. (*Id.* at 246.)

On June 21, 2016, within thirty (30) days of the FAB's Final Decision, Adams filed her Request for Reconsideration.[20] (*Id.* at 78–79.) In her Request for Reconsideration, Adams argued

---

[17] Even though there were no findings concerning Adams' exposure to beryllium by either the IH or CMC (*see* ECF No. 22-4 at 103–05, 124), the FAB described Adams' exposure to beryllium as an E&I mechanic as "incidental at best" and "insignificant" as a clerk/typist and financial analyst. (ECF No. 22-1 at 253.)

[18] The FAB recognized that one of Adams' articles "indicated that as exposure to beryllium increases, so does the risk of COPD," while the other "linked occupational beryllium exposure to the increased risk of development of COPD." (*Id.* at 251.)

[19] The FAB accorded "greater weight" to the CMC's opinion. (*Id.* at 255.) The Final Decision indicates that Dr. Hughes' opinion was not given probative value because he failed to "discuss [Adams'] exposure history to beryllium and relate how that short period of incidental beryllium exposures, years ago, made a contribution to [her] COPD." (*Id.* at 253.)

[20] Adams' Request for Reconsideration is dated June 21, 2016, while her cover letter is dated June 22, 2016. (*Id.* at 76, 79.)

that she met her burden under Part E of the EEOICPA because she submitted medical literature supporting Dr. Hughes' opinion, showing that "beryllium exposure is associated with . . . the development of COPD." (*Id.* at 78.) Adams also maintained that the District Office and the FAB "relied on an incomplete evaluation of her toxic exposures at [] SRS" and challenged DOL for concluding, in tension with her successful claim for beryllium sensitivity, that there was "insufficient evidence" of her beryllium exposure.[21] (*Id.*) In addition to arguing the foregoing, Adams submitted important, new evidence in support of her claim for COPD.[22] (*Id.* at 79–151.) First, Adams provided a medical opinion from Dr. Peter Frank ("Dr. Frank"), and he observed that Adams' occupational exposure to toxic substances, particularly beryllium, while at SRS was "the most significant risk factor[] for her development of COPD and other related pulmonary conditions."[23] (*Id.* at 79.) In contrast to the findings of the IH and CMC, Dr. Frank suggested that beryllium exposure contributes to the development of COPD. (*Id.* at 83.) Secondly, Adams supplied DOL with new scientific documents detailing occupational COPD.[24] (*Id.* at 106–45 (citing Enrique Diaz-Guzman et al., *Occupational Chronic Obstructive Pulmonary Disease: An Update*, 33

---

[21] Adams vigorously argued that the SEM is not the exclusive means by which a toxic substance might be shown to have been present at a DOE facility because DOL's regulations permit proof of exposure by "appropriate documentation or information." (*Id.* at 78 (quoting 20 C.F.R. § 30.231(b).)

[22] When Adams' claim was before the FAB, she was permitted to submit "new, probative evidence" in her Request for Reconsideration. *See* U.S. DEP'T OF LABOR, FEDERAL ENERGY EMPLOYEES OCCUPATIONAL ILLNESS COMPENSATION PROGRAM ACT PROCEDURE MANUAL (2013), https://www.dol.gov/owcp/energy/regs/compliance/PolicyandProcedures/proceduremanualhtml/unifiedpm_part2/Chapter2-1800FabDecisions.htm (last visited Dec. 1, 2018).

[23] Dr. Frank stated that "[a] risk factor is any attribute, characteristic or exposure of an individual that increases the likelihood of developing a disease or injury." (ECF No. 22-1 at 81.) He further opined that risk factors "do not operate in isolation" and suggested that multiple risk factors may lead to an illness. (*Id.* at 81–82.)

[24] Along with her new scientific articles, Adams resubmitted the two previous articles that were filed with her objections to the Recommended Decision and considered by the FAB's Final Decision. (*Compare id.* at 133–38, *with* ECF No. 22-4 at 67–70, 72–73.)

CLINICS CHEST MED. 625, 626 (2012); DJ Hendrick, *Occupation and Chronic Obstructive Pulmonary Disease (COPD)*, 51 OCCUPATIONAL LUNG DISEASE 947 (1996); Piera Boschetto et al., *Chronic Obstructive Pulmonary Disease (COPD) and Occupational Exposures*, 1:11 J. OCCUPATIONAL MED. & TOXICOLOGY (2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1513231/; *Respiratory Diseases—Input: Occupational Risks*, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, https://www.cdc.gov/niosh/programs/resp/risks.html (last visited Nov. 28, 2018).) Encouraging the FAB to either grant her claim for COPD or remand it to the District Office, Adams maintained that her "new argument and evidence" would have "altered the outcome of the [Final] [D]ecision and the scope of development of [her] claim." (*Id.* at 79.)

On August 19, 2016, the FAB denied Adams' Request for Reconsideration. (ECF No. 22-1 at 2–10.) The Order Denying Reconsideration first recounted the reasons for denying Adams' claim for COPD and examined her newly submitted evidence. (*Id.* at 2–3.) The Order then challenged Dr. Hughes' February 2016 conclusions by referring to his opinions as "anecdotal evidence, not subject to peer review," and suggesting that he did not thoroughly investigate his pool of patients. (*Id.* at 3.) Regarding the scientific articles submitted by Adams, the FAB only stated that "two previously submitted articles suggest but do not e[s]tablish that COPD can be linked to beryllium exposure[,]" while "[t]he remaining articles list potential links between toxic substances and COPD and other lung disorders, such as cigarette smoke, cotton fibers, coal dust, and grain dust." (*Id.*) The FAB also rejected three arguments put forth by Adams, including that the IH only considered her exposures as an E&I mechanic, she frequently visited construction sites with toxins linked to COPD, and her position as a precious metals auditor exposed her to toxic substances with links to COPD. (*Id.* at 4–6.) When accessing her arguments, the FAB concluded that Adams was not "on record" with the description, frequency, and nature of her construction

visits and precious metals auditing. (*Id.* at 4–5.) The FAB described Dr. Frank's medical opinions, quite harshly, as "not well rationalized" and "based on assertions that have no factual basis." (*Id.* at 5.) When the FAB handed down its Order Denying Reconsideration on August 19, 2016, its Final Decision became "final" on this same day for purposes of the EEOICPA.[25] *See* 20 C.F.R. § 30.319(c)(2).

Pursuant to 42 U.S.C. § 7385s-6(a), Adams filed her Complaint against DOL on October 17, 2016. (ECF No. 1.) Adams submitted her Initial Brief on April 3, 2017, arguing that she was denied "[d]ue [p]rocess . . . because [] DOL disregarded substantial, probative evidence in support of her claim."[26] (ECF No. 26 at 11.) Additionally, Adams contends that DOL failed to "properly develop" her claim as required by law, which made the FAB's Final Decision arbitrary and capricious. (*Id.* at 14–15.) She specifically suggests that the IH and CMC's conclusions regarding her COPD are flawed because they ignore her exposure to beryllium.[27] (*Id.* at 15.) Likewise, Adams also forcefully maintains that DOL's Order Denying Reconsideration was arbitrary and capricious because it was "clearly erroneous and unsupported by substantial evidence," and, unlike the CMC, Dr. Frank discussed her exposure to beryllium and its link to COPD. (*Id.* at 17.) Pointing to her scientific articles, Adams relentlessly concludes that "she met her burden of showing that [it] was at least as likely as not that her occupational exposures at [] SRS were . . . a significant factor in aggravating, contributing to, or causing her COPD." (ECF No. 30 at 4.)

---

[25] After issuance of the Order Denying Reconsideration, Adams did not request DOL to reopen her claim for COPD. *See* 20 C.F.R. § 30.320.

[26] Adams does not cite a specific provision of the United States Constitution when alleging that she was denied due process. (ECF No. 26 at 11–20.) Nor does she cite any case law regarding due process. (*See id.*)

[27] Adams also attacks the exclusive use of the SEM as it relates to the conclusions of the IH and CMC. (*Id.* at 14.)

Unsurprisingly, in its Responsive Brief filed on May 3, 2017, DOL starkly disagreed with Adams on multiple fronts. (ECF No. 28.) Maintaining that its Final Decision was not arbitrary and capricious, DOL claims that it adequately reviewed the "medical evidence and factual statements made by Adams," addressed each of her objections, and assisted her with the development of her claim. (*Id.* at 16–18.) DOL further submits that "[t]here was no basis for requesting an assessment of Adams' exposure to beryllium when the [D]istrict [O]ffice had no evidence of a causal link between beryllium and COPD, either from its search of the data in [the] SEM or as established by a well-rationalized medical opinion." (*Id.* at 17.) DOL also argues that its Order Denying Reconsideration was not arbitrary and capricious because Dr. Frank's report was not supported by factual evidence, two scientific articles were previously submitted, four scientific articles were inconsequential, and Adams "did not sufficiently prove that her exposure to beryllium" was a significant factor in aggravating, contributing to, or causing her COPD. (*Id.* at 20.) Lastly, DOL contends that Adams' [d]ue [p]rocess argument is without merit because she does not have any property interest in benefits under the EEOICPA, and she was afforded "her notice and opportunity to respond." (*Id.*)

Upon receiving DOL's Responsive Brief, Adams attacked DOL's exclusive use of the SEM because it "was never intended to be utilized . . . as an exclusive measure of an employee's toxic exposures." (ECF No. 3 at 6 (citing 20 C.F.R. § 30.231(b) ("OWCP site exposure matrices may be used to provide probative factual evidence that a particular substance was present at . . . a DOE facility . . . .").) According to Adams, DOL acted arbitrarily by ignoring her previous exposure to beryllium when the SEM failed to identify it as related to COPD. (*Id.* at 3.) Adams adamantly refuted DOL's assertion that she failed to carry her burden under Part E of the EEOICPA. (*Id.* at 2–4.) Adams charges that her scientific articles, including from the National

Institute for Occupational Safety and Health, show that beryllium is associated with COPD and at least as likely as not a significant factor in aggravating, contributing to, or causing her COPD. (*Id.* at 4–5.) In response, DOL continues to insist that it had no obligation to investigate Adams' beryllium exposure, let alone ask the IH or CMC for their opinions regarding beryllium, when Adams failed to provide sufficient evidence "to establish a causal link between her COPD and any potential beryllium exposure at [] SRS." (ECF No. 32 at 3.)

On May 25, 2017, this matter was completely and fully briefed by the parties. (*See* ECF Nos. 26, 28, 30, 32.) As of this date, there have been no further motions or responses from the parties. Therefore, this matter is ripe for judicial review. *See generally Sauls v. Wyeth Pharm., Inc.*, 846 F. Supp. 2d 499, 501 (D.S.C. 2012) ("The parties have fully briefed the issues, and this matter is ripe for consideration.").

## II. SUBJECT-MATTER JURISDICTION

### A. <u>DOL's Final Decision</u>

Subject-matter jurisdiction "involves a court's power to hear a case" and may never be "forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). A federal court has an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). Part E of the EEOICPA provides the following jurisdictional provision for federal courts:

> A person adversely affected or aggrieved by a final decision of the Secretary under this part may review that order in the United States district court in the district in which the injury was sustained, the employee lives, the survivor lives, or the District of Columbia, by filing in such court *within 60 days after the date on which that final decision was issued* a written petition praying that such decision be modified or set aside. . . . Upon such filing the court *shall have jurisdiction* over the proceeding and shall have the power to affirm, modify, or set aside, in whole or

in part, such decision. The court may modify or set aside such decision only if the court determines that such decision was arbitrary and capricious.

42 U.S.C. § 7385s-6(a) (emphasis added). While this provision explicitly grants a federal court subject-matter jurisdiction to review final decisions by DOL, the EEOICPA's sixty-day (60) filing deadline is a jurisdictional prerequisite for judicial review. *See Barrie v. U.S. Dep't of Labor*, 805 F. Supp. 2d 1140, 1144 (D. Colo. 2011) ("The EEOICPA's 60-day filing deadline is jurisdictional."). *See also Lahndorff v. U.S. Dep't of Labor*, 289 F. Supp. 3d 826, 832 (W.D. Ky. 2017); *Meridieth v. Chao*, 723 F. Supp. 2d 1044, 1048 (E.D. Tenn. 2010). Therefore, in order for a federal court to fully possess subject-matter jurisdiction over an action arising under Part E of the EEOICPA, a claimant must file his or her action within sixty days of the FAB's final decision. *See generally Taylor v. U.S. Dep't of Labor*, CV 115-049, 2016 WL 4099214, at *2 (S.D. Ga. Aug. 2, 2016) ("Taylor's petition was filed more than sixty days after the FAB's final decision, and this [c]ourt has no subject matter jurisdiction with which to move forward." (citing *Barrie*, 805 F. Supp. 2d at 1144)).

On May 25, 2016, the FAB informed Adams that her claim for COPD, brought pursuant to Part E of the EEOICPA, was denied. (ECF No. 22-1 at 246, 249.) On June 25, 2016, Adams, through her attorney, requested that the FAB reconsider its Final Decision denying her claim for benefits. (*Id.* at 77–79.) On August 19, 2016, the FAB denied Adams' request for review of its Final Decision. (*Id.* at 2, 7.) The FAB's Final Decision became "final" on August 19, 2016, the date on which it denied Adams' Request for Reconsideration. *See* 20 C.F.R. § 30.319(c)(2) ("If the FAB denies the request for reconsideration, the FAB decision that formed the basis for the request will be considered 'final' upon the date the request is denied, and no further requests for reconsideration of that particular final decision of the FAB will be entertained."). Accordingly, in order to meet her jurisdictional perquisite, Adams was required to file her Complaint within sixty

(60) days of August 19, 2016. *See* 42 U.S.C. § 7385s-6(a) ("A person adversely affected or aggrieved by a final decision of the Secretary . . . may review that order in the United States district court . . . by filing in such court within 60 days after the date on which that final decision was issued . . . ."). Adams filed her Complaint on October 17, 2016, within sixty (60) days of the Order Denying Reconsideration. (*Compare* ECF No. 1 at 6, *with* ECF No. 22-1 at 2.) DOL has also agreed that Adams timely met her jurisdictional hurdle. (*See* ECF No. 28 at 12–13 ("Adams filed her [C]omplaint before this Court on October 17, 2016, within [sixty] days of the reconsideration denial.").) Because the EEOICPA explicitly confers subject-matter jurisdiction to federal courts, and Adams timely filed her Complaint pursuant to the EEOICPA, this court fully possesses subject-matter jurisdiction to review DOL's Final Decision under 42 U.S.C. § 7385s-6(a).

## B. DOL's Order Denying Reconsideration & Adams' Due Process Challenge

Adams also brings challenges to DOL's Order Denying Reconsideration and alleges violations of the Due Process Clause under the United States Constitution. (ECF No. 26 at 11, 17–20.) DOL seems to suggest that a federal court is provided with subject-matter jurisdiction to review its Order Denying Reconsideration under Part E of the EEOICPA. (*See* ECF No. 28 at 12–13.) Adams, on the other hand, is painstakingly silent as to the court's subject-matter jurisdiction over these claims, but has invoked the APA. (ECF No. 26 at 7–8 (citing 5 U.S.C. §§ 702, 706).) Neither party addresses the basis for the court's subject-matter jurisdiction for the alleged due process violation. (*See* ECF Nos. 26, 28.)

First, examining the Order Denying Reconsideration, as noted previously, Part E of the EEOICPA only provides federal courts with subject-matter jurisdiction to review "a final decision of the Secretary." 42 U.S.C. § 7385s-6(a). Part E of the EEOICPA, however, does not confer subject-matter jurisdiction upon a federal court to review a denial of reconsideration by DOL. *See*

19

*id.* Therefore, the court does not have subject-matter jurisdiction to review the Order Denying Reconsideration under 42 U.S.C. § 7385s-6(a) because it is not "a final decision of the Secretary." Notwithstanding this technical feature of the EEOICPA, the court possesses subject-matter jurisdiction to review the Order Denying Reconsideration under the APA, a federal statute, because whether DOL's Order Denying Reconsideration is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA is a federal question under 28 U.S.C. § 1331.[28] 5 U.S.C. § 706(2)(A). *See also Lee v. U.S. Citizenship & Immigration Servs.*, 592 F.3d 612, 619 (4th Cir. 2010) (holding that the APA does not confer jurisdiction and "the jurisdictional source" for the APA is 28 U.S.C. § 1331). *See generally Lanier v. U.S. Dep't of Labor*, 296 F. Supp. 3d 834, 839 (W.D. Ky. 2017); *Lahndorff*, 289 F. Supp. 3d at 830; *Jeffords v. U.S. Dep't of Labor*, C/A No. 5:14-cv-00165-GNS-LLK, 2016 WL 2745865, at *1 (W.D. Ky. May 10, 2016); *Freeman v. U.S. Dep't of Labor*, No. 5:14-cv-114-GNS-LLK, 2015 WL 5020697, at *2 (W.D. Ky. Aug. 24, 2015).

Second, turning to Adams' due process challenge, 28 U.S.C. § 1331 provides that: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution . . . of the United States." The Constitution has several provisions relating to due process. *See* U.S. CONST. amends. V, XIV. As such, the court has subject-matter jurisdiction to review Adams' due process allegations under 28 U.S.C. § 1331.

### III. STANDARD OF REVIEW

Under Part E of the EEOICPA, a federal court may modify or set aside a decision from

---

[28] Had Adams not invoked or mentioned the Administrative Procedure Act ("APA") (ECF No. 26 at 6–8), it is doubtful that this court would have had subject-matter jurisdiction to review the Order Denying Reconsideration.

DOL "only if the court determines that such decision was arbitrary and capricious."[29] 42 U.S.C. §

7385s-6(a). When determining if an agency's decision is arbitrary and capricious, a federal court's

review is narrow. *See Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 284 (4th

Cir. 1999). *See also AES Sparrows Point LNG v. Wilson*, 589 F.3d 721, 733 (4th Cir. 2009) (noting

that the arbitrary-and-capricious standard is "narrow and highly deferential"). Although a federal

court must conduct a "searching and careful" factual inquiry under the arbitrary-and-capricious

standard, it "is not empowered to substitute its judgment for that of [an] agency." *Citizens to

Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). An agency's final decision is

"accord[ed] substantial deference and [is] presume[ed] valid." *Ergon-W. Va., Inc. v. U.S. Envtl.

Prot. Agency*, 896 F.3d 600, 609 (4th Cir. 2018). *See also Nat. Res. Def. Council, Inc. v. U.S. Envtl.

Prot. Agency*, 16 F.3d 1395, 1400 (4th Cir. 1993). When a matter involves "not just simple findings

---

[29] The standard of review of Part E of the EEOICPA is similar, if not identical, to the standard of review under the APA. *Compare* 42 U.S.C. § 7385s-6(a) ("The court may modify or set aside such decision only if the court determines that such decision was arbitrary and capricious."), *with* 5 U.S.C. § 706(2)(a) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). The United States Court of Appeals for the Fourth Circuit has long held that "similar statutory provisions in pari materia should receive similar and harmonious construction." *Hallenbeck v. Penn Mut. Life Ins. Co.*, 323 F.2d 566, 571 (4th Cir. 1963) (citation omitted). *See generally Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006) ("[U]nder the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read 'as if they were one law.'" (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972))). The court observes no need to deviate from this long-established principle, and neither party has argued that it should. (*See* ECF Nos. 26, 28.) As such, case law interpreting the APA's standard of review provides useful guidance for interpreting the standard of review under Part E of the EEOICPA. *See Stephens v. U.S. Dep't of Labor*, 571 F. Supp. 2d 186, 191 (D.D.C. 2008) ("Because of the similarity between this standard of review and the standard set forth in the [APA], case law interpreting the APA's standard of review provides useful guidance."). *See also Lucero v. U.S. Dep't of Labor*, No. 14-cv-00999, 2016 WL 9819533, at *7–8 (D.N.M. Aug. 5, 2016); *Iuculano v. U.S. Dep't of Labor*, No. CV–06–5071–RHW, 2013 WL 11256739, at *4 (E.D. Wash. Nov. 25, 2013); *Valero v. U.S. Dep't of Labor*, No. CV–06–5071–RHW, 2013 WL 12202734, at *5 (E.D. Wash. Jan. 11, 2013). In their pleadings before the court, both parties readily apply case law arising under the APA. (*See* ECF No. 26 at 7–8; ECF No. 28 at 13–15.)

of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'" *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983)). Nevertheless, while an agency's decision is given deference under the arbitrary-and-capricious standard, judicial review is not reduced "to a rubber stamp of agency action." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012) (quoting *Ohio Valley Envtl. Coal.*, 556 F.3d at 192). A federal district court need not "accept without question administrative pronouncements clearly at variance with established facts." *Nat'l Labor Relations Bd. v. Morganton Full Fashioned Hosier Co.*, 241 F.2d 913, 915–16 (4th Cir. 1957). Moreover, a court need not "accept an agency's blanket conclusions at face-value." *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 294 (4th Cir. 2018).

The United States Court of Appeals for the Fourth Circuit has explained when an agency's decision is arbitrary and capricious:

> Agency action is arbitrary and capricious if the agency relies on factors that Congress did not intend for it to consider, entirely ignores important aspects of the problem, explains its decision in a manner contrary to the evidence before it, or reaches a decision that is so implausible that it cannot be ascribed to a difference in view.

*Bedford Cty. Mem'l Hosp. v. Health & Human Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985) (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). *See also United States v. F/V Alice Amanda*, 987 F.2d 1078, 1085 (4th Cir. 1993) (citing *Bedford Cty. Mem'l Hosp.*, 769 F.2d at 1022). In the absence of "that minimal level of analysis," an agency's decision "is arbitrary and capricious and . . . cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). On the other hand, when "the agency 'provide[s] an explanation of its decision that includes a rational connection between the facts

found and the choice made,'" the decision is not arbitrary and capricious. *See Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297–98 (4th Cir. 2018) (quoting *Ohio Valley Envtl. Coal.*, 556 F.3d at 192). To avoid being an arbitrary-and-capricious decision, the agency's explanation must be "based on a consideration of the relevant factors" and possess "a clear error of judgment." *Inova Alexandra Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001) (quoting *State Farm*, 463 U.S. at 43).

## IV. DISCUSSION

Pursuant to 42 U.S.C. § 7385s-6(a) and 5 U.S.C. § 706(2)(A), Adams attacks two of DOL's decisions concerning her COPD claim. (ECF No. 26 at 12–20; ECF No. 30 at 1.) First, Adams submits that DOL's Final Decision was arbitrary and capricious. (ECF No. 26 at 12–17.) Second, Adams argues that DOL's Order Denying Reconsideration was likewise arbitrary and capricious. (*Id.* at 17–20.) Lastly, Adams seems to suggest that she was somehow denied due process under the United States Constitution. (*Id.* at 11, 19.) The court will specifically address each of Adams' contentions in turn.[30]

### A. **The Final Decision of DOL**

Prior to receiving the FAB's Final Decision, Adams submitted several objections to the District Office's Recommended Decision. (ECF No. 22-4 at 63–73.) One of her principal objections concerned DOL's lack of attention to her "increased risk of developing COPD" as a result from her exposure to beryllium. (*Id.* at 64.) She submitted several scientific articles in support of her claim. (*Id.* at 67–73.) One of those articles, which is from a government agency, concluded the following about workers exposed to "hazardous levels" of beryllium: "As exposure

---

[30] DOL readily agrees that Adams is seeking judicial review of its Final Decision and Order Denying Consideration. (ECF No. 28 at 16–21.) DOL concurs that Adams brings a due process challenge. (*Id.* at 20–21.)

to beryllium increased, so did the risk of COPD." (*Id.* at 68 (citing NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, HEALTH CONCERNS FOR WORKERS WHO WORKED AROUND BERYLLIUM (2011), https://www.cdc.gov/niosh/pgms/worknotify/pdfs/Beryllium_Notification-508.pdf (last visited Nov. 26, 2018)).) The findings of the second article "suggest[ed] that COPD . . . [is] related to beryllium exposure." (*Id.* at 72 (citing Mary K. Schubauer-Berigan et al., *Cohort Mortality Study of Workers at Seven Beryllium Processing Plants: Update and Associations with Cumulative and Maximum Exposure*, 68 OCCUPATIONAL & ENVTL. MED. 345 (2011)).) DOL's Final Decision recognized that the former article "indicated that as exposure to beryllium increases, so does the risk of COPD," while the latter article "linked occupational beryllium exposure to the increased risk of development of COPD." (ECF No. 22-1 at 251.) Despite making its own conclusions in regard to these studies, DOL attempted to distinguish them by reasoning that the employees within those studies "would have had major exposures to beryllium," which is inapplicable to Adams' case. (*Id.* at 253.) DOL's conclusion, though more akin to an unsupported presumption, regarding Adams' beryllium exposure is unfounded and devoid of any factual merit. DOL granted Adams' claims for beryllium sensitivity, respectively, on November 20, 2013, and June 30, 2014. (ECF No. 22-5 at 80, 223.) Even though it granted prior beryllium claims, DOL did not, and has not, conducted any medical assessment of Adams' exposure to beryllium. (*See* ECF No. 22-1 at 252–53; ECF No. 22-5 at 234.) Based upon the administrative record, it is simply impossible for DOL to "conclude" that Adams did not have a major exposure to beryllium that contributed to her COPD when it failed to determine her exposure levels to that particular substance.[31] (*See* ECF Nos. 22-1,

---

[31] In the Final Decision, DOL stated that Adams' exposure to beryllium as an E&I mechanic was "incidental at best," but how the FAB made this finding is beyond anything within the administrative record before the court. (*See* ECF No. 22-1 at 253.) Indeed, the CMC and IH made no determinations concerning Adams' exposure to beryllium. (*See id.* at 252–53.)

22-2, 22-3, 22-4, 22-5.) Moreover, DOL's dismissive attitude of Adams' exposure to beryllium is plainly at odds with its prior grant of her beryllium sensitivity claim, which is an affirmative acknowledgement that she was exposed to some amount of beryllium. (*See* ECF No. 22-5 at 233–35.) DOL has clearly decided to act "at variance with established facts" and create a fiction for Adams' unknown beryllium exposure. *Morganton Full Fashioned Hosier Co.*, 241 F.2d at 915–16. DOL's explanation is not the only way, however, in which it has justified its Final Decision in a manner "contrary" to the evidence before it and acted in an arbitrary-and-capricious manner.[32] *Bedford Cty. Mem'l Hosp.*, 769 F.2d at 1022.

Adding to its already questionable actions, DOL decided to "ignore[] important aspects of the problem" presented by Adams' claim. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. The EEOICPA provides that a claimant is entitled to benefits when he or she shows that (1) "it is at least as likely as not that exposure to a toxic substance at a [DOE] facility was a significant factor in *aggravating, contributing to, or causing the illness*"; and (2) "it is at least as likely as not that the exposure to such toxic substance *was related to employment* at a [DOE] facility." 42 U.S.C. §§ 7385s-4(c)(1)(A)–(B) (emphasis added). The aforementioned statutory language denotes that a claimant's exposure to a toxic substance need not be the sole cause of an illness, but may, instead, be a significant factor in *contributing to* or *aggravating* an illness.[33] *Id.* As admitted in DOL's

---

[32] DOL's contradictions within its Final Decision are not lost upon the court. (*See* ECF No. 22-1 at 252–53.) While opining that "[b]eryllium is not usually associated as a causative factor for development of COPD," the Final Decision eventually notes that "the levels of exposure that an employee would need to develop beryllium sensitivity is much different than [that] to contribute to the development of COPD." (*Id.*)

[33] Part E of the EEOICPA does not define the terms "aggravating" or "contributing." *See* 42 U.S.C. § 7385s. "Contributing" is best defined as: "A factor that—though not the primary cause—plays a part in producing a result." *Contributing Cause*, BLACK'S LAW DICTIONARY (10th ed. 2014). "Aggravating" is principally understood as: "[Circumstances] made worse or more serious by circumstances such as intention to cause harm or reckless disregard for another's safety." *Aggravated*, BLACK'S LAW DICTIONARY (10th ed. 2014). While a claimant still retains the burden

Final Decision, Adams came forth with evidence showing that beryllium exposure may increase the risk of developing COPD. (ECF No. 22-1 at 251.) However, nowhere in its Final Decision does DOL actually consider or determine whether Adams possessed an *increased risk* of developing COPD. (*See id.* at 251–56.) Nor does the Final Decision explain whether an *increased risk* of developing an illness is a *significant factor* in *contributing to* or *aggravating* that illness. (*See id.*) As such, given that Adams was exposed to some amount of beryllium, as evidenced by her successful beryllium sensitivity claim, DOL has conveniently ignored an important aspect of Adams' COPD claim: whether her exposure to beryllium *increased her risk* of developing COPD, and, *if she possessed an increased risk*, *whether that risk was a significant factor in contributing to* or *aggravating* her alleged, current condition. *See generally Util. Solid Waste Activities Grp. v. Envtl. Prot. Agency*, 901 F.3d 414, 426–30 (D.C. Cir. 2018) (holding that the Environmental Protection Agency acted arbitrarily and capriciously when it "only partially address[ed] the first half of [a] statutory requirement"). Adams brought this intricate problem to DOL's attention, but DOL, for some unknown reason, ignored it as if it was fanciful. (*Compare* ECF No. 22-4 at 64–65, *with* ECF No. 22-1 at 251–56.) Therefore, by essentially abdicating the statutory scheme of the EEOICPA, DOL "ignores important aspects of the problem" presented by Adams' claim for COPD and has added to its already arbitrary-and-capricious actions. *Bedford Cty. Mem'l Hosp.*, 769 F.2d at 1022–23.

While the court is required to presume DOL's Final Decision is valid and accord it deference, it need not accept the Final Decision when there is not a rational connection between the facts and the ultimate choice made. *See Ergon-W. Va., Inc.*, 896 F.3d at 609; *Jimenez-Cedillo*,

of proof, Part E of the EEOICPA broadly anticipates the ways in which a toxic substance may lead to an illness. *See* 42 U.S.C. § 7385s-4(1)(A); 20 C.F.R. § 30.111(a).

885 F.3d at 297–98. In *F/V Alice Amanda*, the Fourth Circuit held that the National Marine Fisheries Service acted arbitrarily and capriciously when it failed to consider the relevant factors distinguishing frozen scallops and iced scallops. 987 F.2d at 1087. The Fourth Circuit specifically noted that the National Marine Fisheries Service acted "without regard to any studies or discussion of policy" when it adopted a memo requiring frozen scallops to comply with the meat size requirements for normal, iced scallops. *Id.* Eerily similar to the National Marine Fisheries Service's memo, DOL's Final Decision barely touches upon the studies presented by Adams and the relevant factors and issues they present. (*See* ECF No. 22-1 at 251, 253.) Here, too, DOL has ignored the relevant science and made a scant attempt to distinguish the relationship between beryllium exposure and an elevated risk of developing COPD.[34] (*Id.* at 253.) While DOL noted many of Adams' objections in its Final Decision and adequately justified its worries about Dr. Hughes' medical opinion, it still ignored important questions concerning the relationship between beryllium and COPD and its silence cannot withstand an arbitrary-and-capricious analysis. *See F/V Alice Amanda*, 987 F.3d at 1086–87. DOL's Final Decision fails to have a rational connection between the facts and the ultimate choice made when it cherry-picks evidence supporting its decision and neglects to substantively confront the relationship between the elevation of risk and aggravation of a disease. *See Ergon-W. Va., Inc.*, 896 F.3d at 609; *Jimenez-Cedillo*, 885 F.3d at 297–98. As such, DOL's Final Decision remains arbitrary and capricious in this regard.

Lastly, DOL's reliance upon the SEM does not and cannot justify its arbitrary-and-

---

[34] The Fourth Circuit requires the invalidation of agency action when an agency fails to comply with its own mandates. *See United States v. Morgan*, 193 F.3d 252, 266–67 (4th Cir. 1999). DOL's regulations state: "The FAB will consider objections filed by a claimant and conduct a hearing, if requested to do so by the claimant, before issuing a final decision on the claim for entitlement." 20 C.F.R. § 30.300. DOL violated its own regulations by failing to consider the notion of an elevated risk, the central focus of Adams' objection. (*See* ECF No. 22-1 at 253.) DOL's Final Decision cannot stand in the face of its actions.

capricious actions. (ECF No. 22-1 at 254; ECF No. 28 at 17.) At multiple points, DOL's Final Decision stated that "[t]he SEM . . . identified that an E&I mechanic had the potential for exposure to the toxic substances of asbestos, cement, chlorine, coal dust, nitrogen dioxide, phosgene and/or crystalline silicon dioxide which are related to the health effect of COPD." (ECF No. 22-1 at 254.) Additionally, DOL contends that "there was no basis for requesting an assessment of Adams' exposure to beryllium when the [D]istrict [O]ffice had no evidence of a causal link between beryllium and COPD, either from its search of the data in [the] SEM or as established by a well-rationalized medical opinion." (ECF No. 28 at 17.) As pointed out by Adams, the SEM is not a dispositive means by which a claimant can establish a relationship between a toxic substance and illness.[35] *See* 20 C.F.R. § 30.232(b) ("The employee . . . may also submit to OWCP *other evidence* not described in paragraph (a) of this section showing that the employee has or had an illness *that resulted from an exposure to a toxic substance* during the course of employment at either a DOE facility or a RECA section 5 facility, as appropriate." (emphasis added)). Supposedly, at the time of Adams' claim, DOL did not use the SEM as a dispositive tool and specifically stated the following: "The SEM is not used to establish or deny causation by itself, but is used as a tool to assist in the evaluation of causation in light of the evidence as a whole. . . . Under no circumstances is [the] SEM used as a stand alone tool to deny a claim." *See* U.S. DEP'T OF LABOR, FEDERAL ENERGY EMPLOYEES OCCUPATIONAL ILLNESS COMPENSATION PROGRAM ACT PROCEDURE MANUAL (2013),

---

[35] Adams argues that "the SEM is not and was never intended to be utilized by [] DOL as an exclusive measure of an employee's toxic exposures." (ECF No. 30 at 3 (citing 20 C.F.R. § 30.231(b)).) Adams' reliance upon 20 C.F.R. § 30.231(b) is misplaced because that specific regulation does not discount the relevance of the SEM when establishing whether a particular toxic substance was present at a facility. *See* 20 C.F.R. § 30.231(b). Indeed, the regulation states nothing about proving the causal relationship between a toxic substance and an illness. *See id*. The court finds that 20 C.F.R. § 30.232 provides better guidance regarding a claimant's options to demonstrate the relationship between a toxic substance and an illness.

https://www.dol.gov/owcp/energy/regs/compliance/PolicyandProcedures/proceduremanualhtml/unifie

dpm/Unifiedpm_part2/Chapter2-1800FabDecisions.htm (last visited Dec. 13, 2018). Moreover, even

on its own website, DOL currently tells the public that the SEM is not the ultimate authority and

"[does not] represent an exclusive list of the pathways necessary for an affirmative Part E causation

determination." *EEOICP Site Exposure Matrices Website—Home Page DOE Facilities and RECA*

*Sites Data*, U.S. DEP'T OF LABOR, https://www.sem.dol.gov (last updated May 22, 2018). Given

that there has been a deviation from its own regulations, DOL cannot hide behind the SEM in order

to claim that it did not act arbitrarily and capriciously. *See Simmons v. Block*, 782 F.2d 1545, 1550

(11th Cir. 1986) (citing *Boyd v. Sec'y of Agric.*, 459 F. Supp. 418 (D.S.C. 1978)). *See also United*

*States v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969) ("An agency of the government must

scrupulously observe rules, regulations, or procedures which it has established. When it fails to do

so, its action cannot stand and courts will strike it down."). After Adams presented her objections

and evidence refuting the SEM and Recommended Decision, the Final Decision's reliance upon

the IH and CMC's conclusions became glaringly problematic because those conclusions were

exclusively grounded in the SEM, ignored the new, relevant science, and failed to consider Adams'

beryllium exposure. (*See* ECF No. 22-1 at 250, 252.) In other words, the Final Decision, by relying

on tainted conclusions that only exist because of the SEM, is inherently flawed. *See Ergon-W. Va.,*

*Inc.*, 896 F.3d at 610 (holding that an "agency's reliance on a facially-flawed report" may be

arbitrary and capricious under the APA).

The Fourth Circuit has made clear that this court is not required to be a "rubber stamp" for

DOL's Final Decision. *Ohio Valley Envtl. Coal.*, 556 F.3d at 192. In this case, DOL has not acted

without a "clear error of judgment" when it blatantly ignored the elevated risk associated between

the exposure to a toxic substance and the subsequent development of a specific illness. *Inova*

*Alexandra Hosp.*, 244 F.3d at 250. Put differently, DOL "ignore[d] important aspects of the problem" before it within its Final Decision. *F/V Alice Amanda*, 987 F.2d at 1085. Based upon the foregoing, DOL's Final Decision is arbitrary and capricious and must be set aside pursuant to 42 U.S.C. § 7385s-6(a).

## B. DOL's Denial of Adams' Request for Reconsideration

Before taking up the merits of Adams' argument against the Order Denying Reconsideration, the court must first address the reviewability of this decision by DOL and the appropriate standard of review. The parties have proceeded under the crucial, but debatable, assumption that DOL's Order Denying Reconsideration is reviewable[36] and only seem to disagree about the appropriate standard of review. (*See* ECF Nos. 26, 30, 28.) The court addresses all of these issues below.

### i. Reviewability and Standard of Review

Neither party has argued or briefed whether requests for reconsideration are reviewable. (*See* ECF Nos. 26, 30, 28.) Generally, a federal court has no duty to consider arguments or issues that the parties did not address. *See U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 697 (D.C. Cir. 2016) ("'It is not our duty' to consider 'novel arguments a [party] could have made but did not.'" (quoting *United States v. Laureys*, 653 F.3d 27, 32 (D.C. Cir. 2011))). However, whether the court is *authorized* to review DOL's Order Denying Reconsideration under the APA

---

[36] The United States Court of Appeals for the Sixth Circuit has held that requests to reopen Part B claims under the EEOICPA are reviewable under the APA, but only when new evidence is submitted by a claimant. *See Berry v. U.S. Dep't of Labor*, 832 F.3d 627, 636 (6th Cir. 2016). At least one federal court, within the Sixth Circuit, has determined that requests to reopen Part E claims under the EEOICPA are reviewable if new evidence is submitted, but did not explicitly decide whether the EEOICPA or APA provided the means for that review. *See Featherston v. U.S. Dep't of Labor*, C/A No. 5:14-cv-00132-GNS-LLK, 2016 WL 4746211, at *5 (W.D. Ky. Sept. 12, 2016).

is an important threshold inquiry and presents jurisdictional implications. *See Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193–96 (4th Cir. 2013) (holding that the U.S. Army Corps of Engineers did not perform "final agency action" subject to judicial review under the APA); *Wade v. Blue*, 369 F.3d 407, 411 n.2 (4th Cir. 2004) ("[A] specific limitation on federal court jurisdiction . . . overrides the general grant of federal jurisdiction in § 1331."). The APA authorizes a federal court to review "final agency action" and "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable" when a "final agency action" is subject to review. 5 U.S.C. § 704. In this instance, although DOL's Order Denying Reconsideration is a procedural decision,[37] it is subject to review under the APA because this court is authorized to examine DOL's Final Decision under Part E of the EEOICPA.[38] *See supra* Part II.A. However, the inquiry does not end here. While the APA generally permits judicial review when a person suffers a "legal wrong because of agency action," its judicial review provisions are inapplicable if a federal statute "preclude[s] judicial review" or an "agency action is committed to agency discretion by law." 5 U.S.C. §§ 701(a)(1)–(2), 702. *See also Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 629 n.3 (4th Cir. 2017) ("It is worth noting that the APA generally permits judicial review of agency action when a person suffers a 'legal wrong because of agency action' . . . . However, the APA carved out an exception to its application where 'statutes preclude judicial review' or the 'agency action is committed to agency discretion by law.'" (quoting 5 U.S.C. §§ 701(a)(1)–(2), 702) (internal citation omitted)). Part E of the EEOICPA does

---

[37] Under DOL's regulations, its Order Denying Reconsideration is not the same as its Final Decision. *See* 20 C.F.R. § 30.319(c)(2). DOL's Final Decision became "final" when its Order Denying Reconsideration, a procedural determination, was handed down. *See id.*

[38] The APA does not state that intermediate or procedural decisions cannot be examined if a "final agency action" is being examined under another federal statute as opposed to the APA. *See* 5 U.S.C. § 704.

not foreclose or forbid a federal court from reviewing a reconsideration decision, and nor does it specifically commit a reconsideration decision to DOL's discretion. *See* 42 U.S.C. § 7385s-6(a). Therefore, pursuant to the provisions of the APA, the court is duly authorized to review DOL's Order Denying Reconsideration. 5 U.S.C. §§ 701(a)(1)–(2), 702, 704.

Second, turning to the correct standard of review, Adams has maintained, and conceded to an extent, that the standard of review for DOL's Order Denying Reconsideration is the arbitrary-and-capricious standard. (*See* ECF No. 26 at 17–20; ECF No. 30 at 1, 4–7.) DOL, on the other hand, has submitted that its Order Denying Reconsideration was not "clearly erroneous" and there was no "clear error." (ECF No. 28 at 18.) The APA, the appropriate statute under which to review DOL's Order Denying Reconsideration, allows a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA does not provide a "clearly erroneous" or "clear error" standard to review DOL's Order Denying Reconsideration. *See* 5 U.S.C. §§ 706(2)(A)–(F). As such, the court's standard of review is the arbitrary-and-capricious standard, which this court has carefully articulated. *See supra* Part III.

### ii. **The Order Denying Reconsideration**

When Adams submitted her Request for Reconsideration, she included additional scientific articles, along with a report from Dr. Frank, for the FAB to consider. (ECF No. 22-1 at 82–83, 106–45.) DOL stated that several of these articles "suggested but do not establish that COPD can be linked to beryllium exposure." (*Id.* at 3.) Besides quoting one article and vehemently disputing the findings of Dr. Frank, DOL essentially stayed silent on Adams' submissions.[39] (*See id.* at 3–

---

[39] To its credit, DOL did opine that Adams was not subject to "massive dust exposure" as one of the newly submitted articles suggested was required for the development of COPD. (ECF No. 22-

6.) DOL's silence flew in the face of one article that concluded the following: "Careful review of the literature demonstrated that approximately 15% of COPD is work related and *that new agents causing COPD*, as well as news cases with persistent airflow limitation associated with work*, are still being reported.*" (ECF 22-1 at 130 (quoting Piera Boschetto et al., *Chronic Obstructive Pulmonary Disease (COPD) and Occupational Exposures*, 1:11 J. OCCUPATIONAL MED. & TOXICOLOGY (2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1513231/).) Once again, by not addressing the underlying issue, whether beryllium may be a new agent causing, contributing to, or aggravating COPD, DOL disregarded another new aspect of the problem before it. *See Sierra Club*, 899 F.3d at 294 (holding that the National Park Service acted arbitrarily and capriciously when it did not explain "likely inconsistences" that it uncovered and ignored "important aspects" of the problem).

Adams also provided a medical opinion from Dr. Frank in her Request for Reconsideration. (ECF No. 22-1 at 80–83.) Dr. Frank put forth the idea of a "risk factor" and stated that it is "any attribute, characteristic or exposure of an individual that increases the likelihood of developing a disease or injury." (*Id.* at 81.) He specifically stated that "[risk factors] do not operate in isolation," but coexist and interact with one another to produce [a] disease or illness." (*Id.*) He arrived at the conclusion that Adams' exposure to toxic substances, including beryllium, were "significant risk factors for her development of COPD." (*Id.* at 83.) In an ill-fated attempt, DOL stated that Dr. Frank's medical opinion was not "well rationalized," "lacked a factual basis," and "unsupported by the evidence of record." (*Id.* at 5.) DOL is concerned that Dr. Frank's opinion is flawed because "[t]he record does not include any details about [Adams'] work as a precious metals auditor . . . ."

---

1 at 4–5 (citing Enrique Diaz-Guzman et al., *Occupational Chronic Obstructive Pulmonary Disease: An Update*, 33 CLINICS CHEST MED. 625, 626 (2012)).)

(*Id.* at 5.) The perplexing irony of DOL's concern is that Adams indicated that she performed precious metals auditing, but DOL did not develop any additional details when its regulations suggest that it do so. *See* 20 C.F.R. 30.2(a) ("OWCP also provides assistance to claimants and potential claimants by providing information regarding eligibility and other program requirements, including information on completing claim forms and the types and availability of medical testing and diagnostic services related to occupational illnesses under Part B of the Act and covered illnesses under Part E of the Act."). While DOL is certainly at liberty to scrutinize the basis of Dr. Frank's opinion, it failed to acknowledge the question put forth by Dr. Frank: namely, whether beryllium was a "risk factor" that increased "the likelihood" of Adams' development of COPD. (*Id.* at 5–6, 81.) Not only has DOL jettisoned its own regulatory obligation, it has ignored another critical aspect of the problem when given a second chance. (*See id.*) Therefore, given DOL's noticeable silence and lack of explanation regarding "risk factors," the court is unable to ascertain the role it played, if any, in DOL's Order Denying Reconsideration. (*See id.*) This is precisely the type of conduct that fails to survive review under the arbitrary-and-capricious standard. *See Ergon-W. Va., Inc.*, 896 F.3d at 613 (holding that the Environmental Protection Agency acted arbitrary and capriciously by relying on another agency's recommendation "to an unexplained and unknown degree").

Making matters worse for DOL, the contradictions between its Final Decision and Order Denying Reconsideration belie its already precarious position. (*Compare* ECF No. 22-1 at 2–6, *with* ECF No. 22-1 at 249–56.) For example, in DOL's Final Decision, it explicitly stated that one of Adams' submitted articles "indicated that as exposure to beryllium increases, so does the risk of COPD," while the other "linked occupational beryllium exposure to the increased risk of development of COPD." (ECF No. 22-1 at 251.) However, changing its tune, DOL took a different

view of the articles in its Order Denying Reconsideration. (*Id.* at 3.) Concerning these two articles, DOL, blatantly contradicting itself, concluded that the same articles "suggest but do not establish that COPD can be linked to beryllium exposure." (*Id.*) Provided with another chance to correct course, DOL continued to ignore the relevant factors before it and decided, at its own peril, to undermine the development of its own administrative record. (*Compare* ECF No. 22-1 at 2–6, *with* ECF No. 22-1 at 249–56.) This, too, makes the Order Denying Reconsideration arbitrary and capricious. *See City of Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard." (citations omitted)).

While an agency is not required to address all of the contrary evidence before it, it must "grapple with contrary evidence" in a meaningful way. *Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*, 865 F.3d 630, 638 (D.C. Cir. 2017). DOL neglected to honor this mandate by not explaining how it considered "risk factors" in its Order Denying Reconsideration. *See Sierra Club*, 899 F.3d at 293–94 (holding that the National Park Service acted arbitrarily and capriciously when it rendered a decision compounded by omissions). The court will not "rubber stamp" DOL's decisions when it does not conform to its legal obligations, and nor will the court abdicate its role to carefully review DOL's decisions when such unreasonable conduct remains unexplained. *See Ohio Valley Envtl. Coal.*, 556 F.3d at 192; *Sierra Club*, 899 F.3d at 294. For these reasons, DOL's Order Denying Reconsideration is arbitrary and capricious under the APA and must be set aside pursuant to 5 U.S.C. § 706(2)(A).

## C. **DOL's Due Process Violation**

Adams contends that she "was denied [d]ue [p]rocess by [] DOL in her claim for benefits

under Part E" of the EEOICPA because DOL "disregarded substantial, probative evidence in support of her claim." (ECF No. 26 at 11.) Somewhat similarly, she argues that the Order Denying Reconsideration was "not based upon fact," and DOL failed to perform a review "required by [its] procedures and [d]ue [p]rocess." (*Id.* at 19.) While invoking the notions of due process, Adams does not engage in a due process analysis or invoke a specific constitutional provision, nor does she provide the court with any case law to consider. (*See id.* at 11, 19.) Notwithstanding Adams' peculiar and unsupported claim, a federal court is not barred from reviewing a constitutional question involving an administrative proceeding when it possesses jurisdiction. *See Califano v. Sanders*, 430 U.S. 99, 986 (1977) ("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions. . . . [W]hen constitutional questions are in issue, the availability of judicial review is presumed, and we will not read a statutory scheme to take the 'extraordinary' step of foreclosing jurisdiction unless Congress' intent to do so is manifested by 'clear and convincing' evidence." (quoting *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975))); *Mathews v. Eldridge*, 424 U.S. 319, 330–32 (1976) (holding that a final decision under the Social Security Act conveyed jurisdiction over a constitutional claim). *See also Shrader v. Harris*, 631 F.2d 297, 300 (4th Cir. 1980) (holding that the Fourth Circuit possessed jurisdiction over a constitutional claim when the claimant's constitutional claim was "collateral to his claim for benefits" and "the consequent denial of benefits" was final). Because DOL's Final Decision became "final" upon issuance of its Order Denying Reconsideration (ECF No. 22-1 at 6), this court possesses jurisdiction to consider Adams' due process allegation. *Sanders*, 430 U.S. at 986; *Shrader*, 631 F.2d at 300.

In pertinent part, the Due Process Clause of the Fifth Amendment to the Constitution provides: "No person . . . shall be . . . deprived of life, liberty, or property, without due process of

law . . . ."[40] U.S. CONST. amend. V. An individual alleging a violation of the Due Process Clause must first show the deprivation of a constitutionally protected interest: life, liberty, or property. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" (quoting U.S. CONST. amend XIV, § 1)). When determining whether an individual possesses a property interest in government benefits, a person must "have more than abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). If there is a protected interest, a federal court may then determine whether there has been a violation of due process. *See Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 60–61; *Bd. of Regents of State Colls.*, 408 U.S. at 576–77.

Some federal courts have concluded that it is unclear whether applicants have a protected property interest in benefits under the EEOICPA. *See Hooper v. U.S. Dep't of Labor*, No. CV-06-5071-RHW, 2012 WL 12951742, at *3 (E.D. Wash. May 23, 2012); *Barrie v. U.S. Dep't of Labor*, 597 F. Supp. 2d 1235, 1241–42 (D. Colo. 2009). The Fourth Circuit, on the other hand, has concluded that a federal district court must examine whether a statutory provision creates a right, including a "legitimate expectation of receiving benefits and a consequent right to be heard."

---

[40] Similar to the Fifth Amendment, the Fourteenth Amendment to the United States Constitution states that "[no] State shall deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend XIV, § 1. The Due Process Clause of the Fifth Amendment is enforceable against the United States, while the Due Process Clause of the Fourteenth Amendment is enforceable against the States. *See Dusenbery v. United States*, 534 U.S. 161, 167 ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"). Given that DOL, an executive agency within the federal government, is a party to the instant dispute, the Fifth Amendment, rather than the Fourteenth Amendment, is applicable. *See id.*

*Mallette v. Arlington Cty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 640 (4th Cir. 1996). *But see Lyng v. Payne*, 476 U.S. 926, 942 (1986) ("We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment."). The Fourth Circuit has further explained that "eligible applicants are not less entitled to that expectation than are eligible recipients." *Mallette*, 91 F.3d at 640.

Notwithstanding this murky constitutional question, the court need not address it because Adams has failed to sufficiently allege a due process violation. (*See* ECF Nos. 26, 30.) By only stating that she was denied due process when DOL "disregarded substantial, probative evidence" and failed to "consider the arguments presented," Adams has unsuccessfully argued that she has a property interest in the benefits bestowed by the EEOICPA. (*See* ECF No. 26 at 11, 19.) Upon a careful review of her Initial Brief, Adams does not mention, at all, whether she has a constitutionally protected property interest in EEOICPA benefits. (*See id.*) Other federal courts have likewise rejected due process arguments when plaintiffs have failed to articulate their alleged property interest. *See Hooper*, 2012 WL 12951742, at *3 (holding that a plaintiff failed to make out a case of having a protected property interest); *Barrie*, 597 F. Supp. 2d at 1241 ("In order to have a protected interest, Plaintiff would have to first show he was eligible for those benefits. Plaintiff makes out no such case here." (citation omitted)). For these reasons, Adams' attempt to allege a violation of the Due Process Clause of the Fifth Amendment is without merit.

Even if the court were to presume that Adams possessed a constitutionally protected property interest, there would likely not be a violation under the Due Process Clause. At a minimum, the Constitution requires notice and an opportunity to be heard. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993); *Joint Anti-Fascist Refugee Comm. v.*

*McGrath*, 341 U.S. 123, 178 (1951); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 316 (1950). DOL complied with this minimal requirement because it provided Adams with notice of the opportunity to request a hearing, notice of a scheduled hearing, and conducted that hearing on March 29, 2016. (ECF No. 22-1 at 261–82; ECF No. 22-4 at 56, 115.) As such, even if the court assumes that Adams possesses a property interest in benefits under the EEOICPA, DOL would likely not have violated the constitutional minimum of the Due Process Clause of the Fifth Amendment. *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13–16 (1978).

## V. CONCLUSION

Based upon the reasons herein, the Department of Labor's Final Decision (ECF No. 22-1 at 246–57) and Order Denying Reconsideration (ECF No. 22-1 at 2–8) are arbitrary and capricious, respectively, under Part E of the EEOICPA and the APA and must be set aside.[41] Therefore, this case is **REMANDED**[42] to the Department of Labor for further administrative proceedings

---

[41] To date, this is a case of first impression for courts within the Fourth Circuit. Prior to this suit, this court, without reaching the merits of DOL's actions under the arbitrary-and-capricious standard, denied declaratory relief to a claimant under Part E of the EEOICPA and declined to invoke equitable remedies to fashion a remedy. *See Hammond v. United States*, 142 F. Supp. 3d 436 (D.S.C. 2015). Nevertheless, the court is not barred from deciding or ruling on this case merely because it is of first impression within the Fourth Circuit. *See generally Gonzalez v. Sessions*, 894 F.3d 131, 137 (4th Cir. 2018) (accepting a party's concession that an issue was of first impression for the Fourth Circuit's consideration); *Canal Ins. Co. v. Distribution Servs., Inc.*, 320 F.3d 488, 492 (4th Cir. 2003) (considering an argument of first impression within the Fourth Circuit); *United States v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995) (addressing an issue of first impression, within the Fourth Circuit, under the Fourth Amendment). *See also Turner v. BFI Waste Servs., LLC*, 292 F. Supp. 3d 650 (D.S.C. 2017) (deciding a matter of first impression, within the Fourth Circuit, under the Fair Labor Standards Act); *In re Peterson*, 664 F. Supp. 2d 609 (D.S.C. 2009) (ruling on a matter, within the Fourth Circuit, of first impression under the Shipping Act); *Gleaton v. Monumental Life Ins. Co.*, 719 F. Supp. 2d 623 (D.S.C. 2010) (declining to dismiss "an issue of first impression in the Fourth Circuit" under the Family Medical Leave Act); *McHugh v. Carlton*, 369 F. Supp. 1271 (D.S.C. 1974) (deciding a question of "first impression in the United States").

[42] Part E of the EEOICPA provides that a court may "set aside" a final decision by DOL that is arbitrary and capricious. 42 U.S.C. § 7385-6(a). To date, only two other federal courts have determined that DOL's actions were arbitrary and capricious under either Part B or Part E of the EEOICPA. *See Stone v. U.S. Dep't of Labor*, C/A No. 5:15-cv-00250-TBR, 2018 WL 1410841, at

consistent with this decision.

**IT IS SO ORDERED.**

_J. Michelle Childs_

United States District Judge

December 18, 2018
Columbia, South Carolina

---

*6–9 (W.D. Ky. Mar. 21, 2018) (holding that DOL acted arbitrarily and capriciously under Part B of the EEOICPA); _Barrie v. U.S. Dep't of Labor_, 597 F. Supp. 2d 1235, 1242–45 (D. Colo. 2009) (holding that DOL acted arbitrarily and capriciously under Part E of the EEOICPA). Both of those federal courts remanded the cases back to DOL for additional administrative proceedings. _See Stone_, 2018 WL 1410841, at *6–9; _Barrie_, 597 F. Supp. 2d at 1242–45. This court will follow the lead of these other federal courts and will provide DOL with an opportunity to correct its course with additional administrative proceedings.